# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMY BRANCH, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 2:17-CV-00777 |
| | ) |
| vs. | ) Judge J. Nicholas Ranjan |
| | ) |
| MEGAN BRENNAN, UNITED STATES | ) |
| POST MASTER GENERAL, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION ON MOTION FOR NEW TRIAL [ECF 198]

**J. Nicholas Ranjan, United States District Judge**

Before the Court is Plaintiff Amy Branch's motion for new trial following an August 28, 2019 jury verdict in favor of Defendant Megan Brennan (the "Post Office"). For the reasons that follow, the Court will deny Ms. Branch's motion.

## I. BACKGROUND

### A. Factual Background

This is an employment discrimination case brought under Title VII of the Civil Rights Act of 1964. On May 11, 2012, over seven years ago, Ms. Branch, who is African American, was terminated a couple months into her temporary position as a mail sorter at the Post Office by a white supervisor named Richard Gurneal. While the Post Office argued that Mr. Gurneal fired Ms. Branch for making a threat against another white supervisor named Rebecca Scandrol, Ms. Branch denied that she had made such a threat and claimed that the real reason she was terminated was because of her race. Ms. Branch was working the night shift on May 11, 2012, and the entire investigation into the alleged threat occurred in a span of hours, if not minutes. Ms. Branch was terminated from her temporary position at approximately 3:00 am.

To prove that race motivated Mr. Gurneal's decision rather than the fear of a legitimate threat, Ms. Branch introduced testimony at trial regarding a prior incident. A few weeks before her termination, in April 2012, Ms. Branch claims that an African American coworker named Jaison Best attempted to hit her with a heavy piece of equipment. She reported the incident to a white supervisor named Marion Keefer, who did not punish Mr. Best and instead moved Ms. Branch to a different floor of the Post Office. Ms. Keefer had no involvement with respect to Ms. Branch's termination the next month.

Ms. Branch's theory of the case was that when a black perpetrator (Mr. Best) assaulted a black victim (Ms. Branch), the Post Office (Ms. Keefer) did not conduct a proper investigation and did not punish the perpetrator. By contrast, when a black perpetrator (Ms. Branch) allegedly

threatened a white victim (Ms. Scandrol), the Post Office (Mr. Gurneal) summarily fired her. Thus, Ms. Branch attempted to show that Mr. Best was a proper comparator to demonstrate racial discrimination under Title VII.

Therefore, at trial, there were really four key witnesses who would testify about two distinct events: (i) Ms. Branch and Mr. Gurneal, who would testify as to Ms. Branch's termination in May 2012; and (ii) Ms. Keefer and Mr. Best, who would testify as to Ms. Keefer's decision to not terminate Mr. Best in April 2012.

**B.	Procedural Background**

Ms. Branch was granted leave to proceed *in forma pauperis* on June 13, 2017 [ECF 2] and filed her Complaint, *pro se*, on June 15, 2017 [ECF 3], alleging that because she was African American, the Post Office terminated her employment on May 11, 2012.[1] The Post Office answered the Complaint on September 11, 2017 [ECF 9], and on October 18, 2017, an initial case management conference was held before then-presiding Chief Judge Hornak. [ECF13]. Judge Hornak subsequently issued the only Case Management Order in the case, which provided for a deadline for amended pleadings of November 17, 2017. [ECF 14]. On November 21, 2018, the case was reassigned to then-District Judge Phipps. [ECF 55].

Notably, throughout fact discovery and through the disposition of summary judgment motions, Ms. Branch was *pro se.* Though she has an Associate's degree in paralegal studies and a Bachelor's degree in legal studies [ECF 195 at 85:5-6], she chose not to hire a lawyer and not to depose any witnesses during the course of fact discovery, though she did propound discovery requests [ECF 82 at 12:15-21; ECF 201 at 2].

On March 19, 2019, while Ms. Branch was still *pro se*, then-presiding Judge Phipps granted in part and denied in part the Post Office's motion for summary judgment. [ECF 64]. Judge Phipps dismissed Ms. Branch's retaliation claim but kept her discrimination claim. [*Id.*].

On May 9, 2019, Judge Phipps appointed Ms. Branch *pro bono* counsel at the law firm of Reed Smith LLP to represent her at the trial in this case. [ECF 71].[2] On May 14, 2019, Judge Phipps held a telephonic status conference in which Ms. Branch's new attorneys requested that the Court reopen discovery to allow for depositions of current and former Post Office employees. Judge Phipps denied the request, finding that there would be no unfair prejudice to Ms. Branch since she had already received written discovery and "the core witnesses ha[d] already provided sworn statements" in the form of Equal Employment Opportunity Commission (EEOC) affidavits. [ECF 82 at 12:2-21]. Judge Phipps further reasoned that reopening discovery would overly burden the Post Office, which had just "survived discovery" and "received partial summary judgment." [*Id.* at 12:22-25].

---

[1] The Complaint also included a claim for Title VII retaliation, which was dismissed at summary judgment.

[2] The Court commends Reed Smith, and its trial counsel, Andrew Lacy and Christian Saucedo, as well as their supervising attorney, David Fawcett. There is no higher service for an attorney than to represent indigent clients on a *pro bono* basis.

2

On August 6, 2019, the case was reassigned to this Court due to Judge Phipps's elevation to the Third Circuit. [ECF 125]. The Court granted the Post Office's motion to bifurcate the trial into phases for liability and damages [ECF 140], ruled on the various motions *in limine* [ECF 154], and granted Ms. Branch's limited request to depose a former coworker, Shawn Lewis, for use at trial. [ECF 135].

On August 20, 2019, ahead of the pretrial conference, the Court emailed all counsel with guidance on how the trial would proceed. The Court imposed "presumptive time limits" based on the fact that the trial had been bifurcated, the issues, witnesses, and documents were limited, and there was a need to focus the jury's attention. The Court set the presumptive time limits for Ms. Branch's testimony to 30 minutes on direct, Mr. Gurneal's to 30 minutes on direct, Ms. Keefer's to 15 minutes on direct, and all cross-examination to 20 minutes. The email specifically invited the parties to discuss the presumptive time limits at the pretrial conference.

At the pretrial conference on August 23, 2019, counsel for Ms. Branch argued that the Court's intended time limits were too strict. As a result, the Court adjusted the time limits to 60 minutes for Ms. Branch's direct testimony and 60 minutes for Mr. Gurneal's. [ECF 194 at 41:9-25]. However, the Court maintained the 15-minute time limit for Ms. Keefer since Ms. Keefer was not the supervisor who terminated Ms. Branch, and the parties' exhibits did not suggest that additional questioning was necessary. [*Id.* at 45:22-47:14]. The Court nonetheless permitted Ms. Branch to examine Ms. Keefer for 15 minutes, and then to proceed to sidebar to discuss whether counsel would have additional questions related to "other theories" that are "relevant and relate to relevant evidence in this case." [*Id.* at 47:10-14]. The Court reiterated at the pretrial conference that the 15-minute time limit on Ms. Keefer's examination was "based on really the evidence that [the Court has] seen," and, if after 15 minutes, Ms. Branch's counsel is "making great points as to Ms. Keefer that are pointed and direct and are relevant to [Ms. Branch's] theories," the questioning could "go all week," explaining again that the time limits were not about the Court's time but rather "about making sure that the evidence comes in cleanly and in a way that the jury can comprehend" the case. [*Id.* at 52:21-53:17]. At all times, counsel for the Post Office agreed with the Court that the time limits for all trial witnesses were appropriate.

Trial commenced on Monday, August 26, 2019, and as noted above, was limited to liability. That day, both sides presented opening statements, and Ms. Branch's testimony was completed. The next morning, August 27, 2019, Ms. Branch's counsel orally moved to amend the Complaint to include additional "disparate impact" or "pattern and practice" theories of liability, despite the fact that the amendment deadline was November 17, 2017. [ECF 196 at 7:1-4]. Counsel cited no legal authority for the motion [*id.* at 7:1-9:19], and it was denied from the bench. [*Id.* at 11:15-12:8].

That same day, Ms. Branch's counsel called Ms. Keefer and Mr. Gurneal as-on-cross. Ms. Branch's counsel ran out of time during Ms. Keefer's 15-minute examination. The Court entertained argument at sidebar for why Ms. Keefer's examination should be extended, and during that sidebar, Ms. Branch's counsel disclosed, for the first time, that he intended to ask Ms. Keefer about allegations by an undislosed "whistleblower" that Ms. Keefer harbored racial animus towards African Americans. [*Id.* at 31:23-32:9]. Ms. Branch's counsel at first would not

3

reveal the name of the supposed whistleblower, just that the individual currently worked at the Post Office. [*Id.* at 32:15-17].

The Court ruled that Ms. Branch's counsel had not yet laid a foundation that Ms. Keefer played any role in terminating Ms. Branch, and so no whistleblower evidence could come in. [*Id.* at 36:4-6]. However, the Court allowed Ms. Branch's attorneys an additional five minutes of direct examination as-on-cross in order to lay such a foundation. [*Id.* at 35:23-36:3]. The Court stated that if counsel could establish Ms. Keefer's "involvement with respect to the termination of Miss Branch," then it would allow counsel to continue to "probe any racial animus with respect to that." [*Id.* at 35:23-36:8]. Counsel proceeded with five more minutes of questioning, at which point the Court granted counsel yet another sidebar. Counsel requested more time with Ms. Keefer and stated that he would now identify the alleged whistleblower. [*Id.* at 41:5]. The Court ruled that Ms. Branch's counsel still had not laid a foundation in order to examine Ms. Keefer about racial animus, and so her direct examination as-on cross was concluded. [*Id.* at 40:11-15]. Even so, the Court later allowed Ms. Branch's counsel another 20 minutes to re-cross Ms. Keefer, at which point counsel attempted again (unsuccessfully) to lay that foundation. [*Id.* at 53:8-67:22].

Similarly, although the Court had allowed counsel 60 minutes (rather than the original 30 minutes) to conduct the examination of Mr. Gurneal, Ms. Branch's counsel sought additional time at sidebar. The Court allowed Ms. Branch's counsel an additional five minutes to question Mr. Gurneal, resulting in a full 65-minute direct examination. [*Id.* at 119:22-25].

Several additional witnesses, including Jaison Best, were called by both sides, and then both sides rested as to the liability phase of the case. Only eight exhibits were introduced into evidence during the entirety of the liability phase of the trial. [ECF 190]. On August 28, 2019, the jury returned a verdict in favor of the Post Office; as such, no damages phase was necessary, and final judgment was entered. [ECF 191 and 192].

Ms. Branch now brings this motion for a new trial, arguing that: (1) then-presiding Judge Phipps should have reopened discovery upon appointment of her trial counsel; (2) the Court should have granted Ms. Branch's motion to amend her Complaint on the second day of trial to add a new theory of liability; (3) the Court imposed unreasonable time limits on the examination of witnesses; and (4) a combination of all of those issues prejudiced her, and thus merit a new trial.

## II. <u>STANDARD OF REVIEW</u>

A court may grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). It is well settled in this Circuit "that the granting or refusing of a new trial is a matter resting in the sound discretion of the trial judge and his action thereon is not reviewable upon appeal, save in the most exceptional cases." *Silverii v. Kramer*, 314 F.2d 407, 413 (3d Cir. 1963). There is only an abuse of discretion, within the meaning of the Rule, when the action of the trial judge is clearly contrary to reason and not justified by the evidence. *Springfield Crusher, Inc. v. Transcontinental Ins. Co.*, 372 F.2d 125, 126 (3d Cir. 1967).

4

## III. DISCUSSION

### A. Judge Phipps Did Not Abuse His Discretion in Denying Ms. Branch's Motion to Reopen Discovery.

Ms. Branch first argues that then-presiding Judge Phipps abused his discretion in denying her May 14, 2019 request to reopen discovery in light of newly appointed *pro bono* counsel. However, Ms. Branch has failed, then and now, to demonstrate "good cause" for reopening discovery. As such, there was no abuse of discretion.

A district court may modify a scheduling order upon a showing of "good cause." Fed. R. Civ. P. 16(b)(4). This authority extends to requests to reopen discovery, and the decision as to whether to reopen discovery is committed to the sound discretion of the district court. *LeBoom v. Lancaster Jewish Cmty. Ass'n*, 503 F.3d 217, 235 (3d Cir. 2007); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 734 (3d Cir. 1995). "The Court of Appeals will not interfere with the discretion of the district court by overturning a discovery order absent a demonstration that the court's actions made it impossible to obtain crucial evidence, and implicit in such a showing is proof that more diligent discovery was impossible." *Hewlett v. Davis*, 844 F.2d 109, 113 (3d Cir. 1988) (citation omitted).

Ms. Branch failed to demonstrate good cause as to why she was unable to take depositions during the discovery period, or why discovery should be reopened simply because *pro bono* counsel was appointed. As Judge Phipps explained, Reed Smith was appointed as trial counsel after discovery ended and motions for summary judgment were decided. [ECF 82 at 12:2-3 ("I'm very conscious of the fact that discovery closed and that we're trying to wind this case down, not make it big.")]. By the time counsel made this request, the case had been going on "for a long time," and Ms. Branch had ample opportunity to depose the witnesses, but chose not to do so. [*Id.* at 12:7-10]. Judge Phipps ultimately denied the request by reasoning that reopening discovery at such a late stage would prejudice the Post Office and was unnecessary in light of all of the EEOC affidavits of the various Post Office witnesses that had been or were in the process of being produced. As Judge Phipps reasoned:

> At the end of the day I will not permit a day of discovery. My reasoning goes like this: I hear the cost concerns very much, but those have to be balanced against the stage that this case is at as well as the burden that that imposes on Defendants and their attorneys -- their witnesses who have already been exposed to this for a period, even if it wasn't availed. . . . It also comes into fact what Miss Andrade said about the nature of the EEOC investigation, and those will be, I understand, produced.

[*Id.* at 15:13-16:8]. Judge Phipps's ruling properly balanced the prejudice to the Post Office in having to present its witnesses for deposition so late in the case against any prejudice to Ms. Branch of not being able to take additional depositions. *See, e.g., Gadley v. Ellis*, No. 13-CV-17, 2015 WL 2345619, at *10 (W.D. Pa. May 15, 2015) (denying motion to reopen discovery after summary judgment had been decided). Specifically, Judge Phipps found that it would not be "unfairly prejudicial or overly problematic" [ECF 82 at 12:15-16] to Ms. Branch to proceed to trial without deposition testimony, especially considering that the witnesses at issue previously

made written statements under oath during the administrative process before the EEOC concerning her termination and, thus, Ms. Branch always had access to the "sum and substance of what their testimony would be." [*Id.* at 7:1-2]. Given that Ms. Branch's counsel had access to these prior sworn statements, Judge Phipps found that there was no concern of a "trial by ambush." [*Id.* at 11:20-22 (" . . . civil trials are not to be trials by ambush. But also not every witness at every trial has been deposed before they take the stand.")].

Further, Ms. Branch cited no legal authority then or now in support of the proposition that her status as a *pro se* party excused her failure to take depositions. To the contrary, it is well-established that a party's "[p]ro se status does not excuse a party's failure to depose witnesses." *N'Jai v. Bentz*, No. 13-CV-1212, 2016 WL 5468116, at *2, n.2 (W.D. Pa. Sept. 29, 2016) (denying motion to reopen discovery based on plaintiff's *pro se* status). Nor has Ms. Branch cited any authority that the Court's appointment of trial counsel required re-opening discovery. In fact, this Court has held that "[r]etaining new counsel, by itself, does not establish good cause" for reopening discovery. *Trask v. Olin Corp.*, 298 F.R.D. 244, 268 (W.D. Pa. 2014). Accordingly, the Court finds no abuse of discretion in Judge Phipps's decision not to reopen discovery.

**B.     The Court Did Not Abuse Its Discretion in Denying Ms. Branch's Motion to Amend Her Complaint Mid-Trial.**

On the second day of trial, and almost two years after the deadline for amending pleadings, Ms. Branch orally moved to amend her Complaint to add a new claim based on a "disparate impact" or "pattern and practice" theory of liability. Ms. Branch now argues that the Court abused its discretion by not permitting amendment. The argument is not well-taken because 1) Ms. Branch did not demonstrate "good cause" for her failure to amend prior to the deadline for amending pleadings; and 2) permitting amendment at that late stage would have severely prejudiced the Post Office.

*i.     Ms. Branch Did Not Demonstrate Good Cause.*

First, as stated above, the only Case Management Order in this case set the deadline to file amendments to pleadings by November 17, 2017. [ECF 14]. Motions seeking leave to amend a pleading outside of a court's scheduling order are governed by Fed. R. Civ. P. 16. *See Dimensional Commc'n, Inc. v. OZ Optics, Ltd.*, 148 F. App'x 82, 85 (3d Cir. 2005) (instructing that the Third Circuit has adopted a good cause standard when determining the propriety of a motion to amend a pleading after the deadline has elapsed); *Price v. Trans Union, LLC*, 737 F. Supp. 2d 276, 279 (E.D. Pa. 2010) ("where a party seeks to amend its pleadings after a deadline set by court order, the decision whether to allow the amendment is controlled by Rule 16(b)" and the need to show "good cause"). Specifically, Rule 16(b)(4) provides that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). To establish good cause, the party seeking the extension must show that the deadlines set forth in the scheduling order "cannot reasonably be met despite the diligence of the party seeking the extension." Fed. R. Civ. P. 16(b) Advisory Committee Notes to 1983 Amendments. Good cause may also be satisfied if the movant shows that the inability to comply with a scheduling order is "'due to any mistake, excusable neglect or any other factor which might understandably account

6

for failure of counsel to undertake to comply with the Scheduling Order.'" *Newton v. Dana Corp., Parish Div.*, Civ. No. 94–4958, 1995 WL 368172, at *1 (E.D. Pa. June 21,1995) (citation omitted); *MCI Telecomms. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1097 (3d Cir. 1995) (to show good cause, there must be a "demonstration of good faith on the part of the party seeking an enlargement and some reasonable basis for noncompliance within the time specified in the rules.").

Here, Ms. Branch did not demonstrate good cause for amending her pleading to add an entirely new claim based on a new legal theory on the second day of trial, for at least the following two reasons.

First, both at trial and in her post-trial briefs, Ms. Branch does not appear to argue that there is good cause here, at least as recognized by any legal authority. She cites no legal authority that would suggest that the Court erred in refusing her request to amend, and at trial, her counsel also cited no specific legal support for the request, only broadly stating: "I believe there's a ton of case law out there that you should allow amendments of complaints when justice so requires." [ECF 196 at 7: 2-4]. In the absence of any law on this point to support Ms. Branch's position, she has not met her burden.

Second, at trial, Ms. Branch's counsel appeared to suggest that their unfamiliarity with employment law and their recent appointment as trial counsel should excuse the late request to amend. [*Id.* at 7:9-22]. However, it is well-established that an attorney's lack of familiarity with, or experience in, an area of the law does not constitute "good cause" or "excusable neglect" under the Federal Rules. *See Banks v. City of Philadelphia*, 309 F.R.D. 287, 293 (E.D. Pa. 2015); *Lehman Bros Holdings, Inc. v. Gateway Funding Diversified Mortg. Servs., L.P.*, 785 F.3d 96, 102 (3d Cir. 2015). The Court cannot accept Ms. Branch's delayed request as demonstrating or obviating the need for good cause.

> ii. *Allowing Amendment Would Have Prejudiced the Post Office.*

Even if Ms. Branch had demonstrated good cause for her delay in seeking leave to amend, her motion could not be granted because it would have unduly prejudiced the Post Office. While delay alone is insufficient to justify denying leave to amend, "at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Adams v. Gould Inc.*, 739 F.2d 858, 868 (3d Cir. 1984). Courts routinely hold that undue delay may be found where a party seeks to amend a pleading to add a new theory of liability close to trial or even simply after the close of discovery. *See, e.g., Evans v. City of Philadelphia*, 763 F. App'x 183, 185 (3d Cir. 2019) (in Title VII race discrimination case against a city, district court did not abuse its discretion in denying plaintiff's motion to amend where plaintiff moved four months after the close of discovery and one month after the City moved for summary judgment); *Gay v. Petsock*, 917 F.2d 768, 772 (3d Cir. 1990) (denial of attempt to amend on the first day of trial affirmed).

Allowing Ms. Branch to amend her Complaint on the second day of trial to add new theories of liability would have been highly prejudicial to the Post Office's ability to defend itself against those theories, for at least three reasons.

7

First, the Post Office prepared for years for a disparate treatment case, and turning the case into a disparate impact case during trial would have been trial by ambush. *See Summy-Long v. Pa. State Univ.*, 226 F. Supp. 3d 371, 389 (M.D. Pa. 2016) ("To permit a last-ditch alteration in [plaintiff's] case theory [from disparate treatment to disparate impact] would alter the playing field in such a way as to impede presentation of an adequate defense.").

Second, the motion to amend had already been made after the jury had been empaneled and instructed on Ms. Branch's very specific theory of the case (*i.e.*, disparate treatment based on comparator evidence), both sides had opened on that theory, and Ms. Branch (the key witness in the case) had already testified. If the Court had granted Ms. Branch's motion to amend, the jury would have likely been confused, additional witnesses by both parties likely would have to have been summoned, and the trial, in all likelihood, would have had to have been postponed. *See Lundy v. Hochberg,* 79 F. App'x 503, 506 (3d Cir. 2003) (affirming denial of motion for leave to amend pleading on eve of trial where "[t]o have permitted Lundy leave to assert amorphous additional counterclaims at that late date would have prejudiced the plaintiff and caused undue delay, as the trial would have had to be postponed").

Third, Ms. Branch's requested amendment was not minor; it was dramatic. The new theory sought to take aim at the entire United States Postal Service, based on sweeping theories of pattern or practice and disparate impact liability. Ms. Branch's counsel stated as much:

> This case is not just about Miss Branch, and I'm sorry to say that to my client, but this is about the Post Office and discrimination and how they treat black people across this country, Your Honor, across this country, and the discriminatory practices, and that's why I brought this case. That's why I argue this case. That's why I believe in this case; and Your Honor, justice so requires it.

[ECF 196 at 9:12-19]. The Post Office would have been unduly prejudiced if the Court had allowed Ms. Branch to amend her Complaint in the middle of the trial with dramatically new and far-reaching theories of liability that went beyond Ms. Branch's specific case. As such, the Court did not abuse its discretion in denying the motion.

**C.     The Court Did Not Abuse Its Discretion in Imposing Presumptive Time Limits at the Liability Trial in an Even-Handed Manner.**

Ms. Branch's motion also takes issue with the Court's imposing of presumptive time limits for witness examinations. The inherent power of a district court to manage cases before it in a just and efficient manner is codified in the Federal Rules of Evidence. For instance, Fed. R. Evid. 611(a) provides:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

8

Similarly, Fed. R. Evid. 403 permits the exclusion of evidence when its probative value is outweighed by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. The Third Circuit has recognized that a district court may impose limits on the parties' presentation time at trial, so long as the court both "mak[es] an informed analysis based on a review of the parties' proposed witness lists and proffered testimony" and "allocates trial time evenhandedly." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 610 (3d Cir. 1995); *see also In re Baldwin*, 700 F.3d 122, 129 (3d Cir. 2012) (collecting cases). Here, the Court's presumptive time limits were appropriate because the limits were evenhanded and flexible, and Ms. Branch suffered no prejudice.

> *i.* *The Court Properly Imposed Evenhanded, Flexible Time Limits Following an Informed Analysis of the Relevant Trial Record for the Liability Phase.*

Ms. Branch's motion repeatedly refers to "time limits;" however, this is somewhat of a misnomer. At no point did the Court impose hard-and-fast, inflexible time constraints. Rather, the Court imposed *presumptive* time limits based on the record available at the time of trial, and in light of the bifurcated nature of the trial. All time limits were flexible and subject to expansion should counsel be making relevant, non-cumulative points through witness testimony. *See, e.g.,* [ECF 194 at 53:7-11 ("So don't hesitate to approach me, and we will talk at sidebar after your 15 minutes, and you're making great points as to Ms. Keefer that are pointed and direct and are relevant to your theories. We can go all week on that if it's relevant evidence that is critical to your case.")].[3]

Here, the Court properly applied the above legal standard and imposed flexible, evenhanded time limits on witness examinations following an informed analysis of the relevant record. During the pretrial conference, the presumptive time limits were discussed at length.

In support of the time limits, the Court provided: "I can impose time limits so long as I make an informed analysis based on the evidence, the exhibits, the witness lists and the proffered testimony and I allocate the trial time evenly." [*Id.* at 40:23-41:1]; *see also* [*id.* at 27:19-24 ("I have a lot of discretion in terms of setting time limits. The rules of evidence give me that authority, including Rule 611, Rule 403. You know, I can exclude evidence if it is cumulative, places in my view undue burden, but also cumulative and wastes time in the grand scheme of things.")].

The Court stated on the record at the pretrial conference that it "personally viewed all the exhibits in this case" as well as "looked at all the motions that have been filed which tell some of the story in this case" prior to imposing any time limits on the witness examinations. [*Id.* at 28:1-4]. The Court further explained that the time limits were "meant to focus the parties' preparation." [*Id.* at 40:14]. The Court further reasoned that only limited testimony was required since there was limited documentary evidence in this case. Indeed, a review of the trial

---

[3] The Court's per-witness time limits have been used by other judges in this District, including in employment-discrimination cases. *See Endeavor Energy Res., L.P. v. James Ellis, et al.,* 2:13-cv-00542-BRW (per-witness time limits set in case that settled on eve of October 1, 2018, trial)*; Knox v. PPG Indus., Inc.,* 2:15-CV-01434-BRW (per-witness time limits implemented in August 2019 trial).

9

record after the fact reveals that only eight exhibits were ever introduced into evidence. [ECF 190].

Further, the time limits were appropriate, in part, because most of Ms. Branch's witnesses were being called as-on-cross and, therefore, should have been subject to leading questions that elicited only short "yes" and "no" type responses. Simply put, the Court correctly reasoned that Ms. Branch should not have needed much time with her witnesses, particularly since the trial was phased and limited to only liability at that point.

Even so, and as described above, the Court was openminded about the time limits. At the pretrial conference, it doubled the time limits for Ms. Branch's and Mr. Gurneal's direct testimony from 30 to 60 minutes for each side. The Court only refused to expand the 15-minute time limit for Ms. Keefer's direct testimony because she seemingly had no role in Ms. Branch's termination. [ECF 194 at 45:22-47:14]. The Court reiterated at the pretrial conference that the 15-minute time limit on Ms. Keefer's examination was "based on really the evidence that [the Court has] seen," and, if after 15 minutes, Ms. Branch's counsel is "making great points as to Ms. Keefer that are pointed and direct and are relevant to [Ms. Branch's] theories," the questioning could "go all week." [*Id.* at 52:22-53:11].

Subsequently, at trial, the Court expanded the time limits even more. It gave Ms. Branch's counsel 60 minutes on direct to examine Ms. Branch as well as an indefinite amount of time on re-direct, as long as it was limited to the scope of the cross. [ECF 195 at 146:13-17]. As for Mr. Gurneal, the Court granted counsel an additional five minutes for direct examination (so 65 minutes in total) in light of the fact that the Post Office decided not to question him. As for Ms. Keefer, the Court gave counsel an additional five minutes on direct (so 20 minutes total) and then 20 minutes on redirect.

In short, the transcripts from the pretrial conference and trial plainly show that the Court met the standards set by the Third Circuit in imposing presumptive time limits on witness examinations. The Court closely examined the record evidence and paid attention to witness testimony in real time to determine what time limits were fair and appropriate to obtain relevant testimony.[4]

    *ii.    Ms. Branch Was Not Prejudiced by the Presumptive Time Limits.*

Ms. Branch's claim that "the time limits . . . deprived Ms. Branch of the ability to conduct a meaningful examination of hostile witnesses in its case-in-chief within the strict time limits set by the Court" is unsupported by the record. [ECF 198 ¶ 23].

---

[4] At the pretrial conference, Ms. Branch's counsel argued for a block of time of five hours, which would be only for her direct testimony (not inclusive of cross, openings, and closings). [ECF 194 at 23:11-25]. As the Post Office persuasively pointed out, Ms. Branch's counsel never explained why it would take a few witnesses a total of five hours of direct testimony in a liability-only phase, where only a handful of exhibits were used and, at issue, were only two discrete incidents (*i.e.,* the Branch threat/termination, and the Best threat/non-termination). [*Id.* at 25:11-26:22].

10

As to Ms. Keefer's direct examination as-on-cross, a review of the trial record shows that Ms. Branch spent the majority of her 15 minutes examining Ms. Keefer about one subject – whether she thoroughly investigated the incident with Jaison Best by interviewing all of the percipient witnesses. *See, e.g.,* [ECF 196 at 20:23-24 ("Q: And do you vaguely recall this because you didn't conduct a thorough investigation?"); *id*. at 21:6-10 ("Q: And Miss Keefer, did you obtain statements from that investigation? . . . Q: And did you obtain statements from every witness in that investigation?"); *id*. at 26:4-5 ("Q: And as a manager, are you aware that there were other people who were in the vicinity or around on April 30, 2012?"); *id*. at 28:6-7 ("Q: Okay. Were you aware that there were witnesses to the incident in 2012?"); *id*. at 29:17-18 ("Q: And it was your testimony previously that you didn't know whether there were witnesses; correct?"); *id*. at 30:19-20 ("Q: And do you believe that you made every effort to interview all witnesses?"); *id*. at 31:1-2 (the Court noting that "this ground has been plowed")].

Despite this, and in light of the supposed "whistleblower" disclosed for the first time at sidebar, the Court allowed Ms. Branch's attorneys another five minutes to question Ms. Keefer in order to lay a foundation that she played some role in Ms. Branch's termination. Indeed, the Court stated that if counsel used those five minutes to establish Ms. Keefer's "involvement with respect to the termination of Miss Branch," then it would allow counsel an indefinite amount of time to "probe" into Ms. Keefer's alleged racial animus. [*Id.* at 35:23-36:8]. However, counsel failed to lay a foundation in those five minutes that Ms. Keefer had any role in terminating Ms. Branch.

Instead, Ms. Keefer stated that she did not remember ever meeting with Ms. Branch prior to her termination and certainly "never met with [Mr. Gurneal] to discuss anything like" terminating Ms. Branch. [*Id.* at 38:12-18]. After those five minutes, Ms. Branch's counsel requested another sidebar, where he attempted to offer up the identity of the supposed whistleblower, though counsel had previously represented to the Court that the whistleblower's anonymity was of paramount importance. [*Id.* at 41:5]. The Court denied further questioning on direct, observing on the record that Ms. Branch's counsel "spent fifteen minutes asking one question over and over again," improperly failed to disclose the whistleblower on initial disclosures, and still had not laid a foundation to permit any evidence of a whistleblower. [*Id.* at 40:19-41:4].

Even so, the Court later allowed Ms. Branch's counsel another 20 minutes of examination on redirect, during which counsel continued to ask almost exclusively about the sufficiency of Ms. Keefer's investigation of the Jaison Best incident. *See, e.g.,* [*id.* at 53:17-18 ("Q: And is this belief because you believe that you performed a thorough investigation?"); *id.* at 54:9-10 ("Q: Did you obtain statements from every possible witness in that case?"); *id.* at 56:20-21 ("Q: Can you tell the jury why you didn't interview these witnesses?"); *id.* at 57:19-20 ("Q: And you said that was something that you would look into, but you didn't look into it with Miss Branch; right?"); *id.* at 59:20-21 ("Q: Do you still believe you conducted a thorough investigation?")].

Thus, Ms. Branch's repetitive questioning during Ms. Keefer's examination directly contradicts her argument that the 15-minute time limit (which was extended to 20 minutes during trial, plus an additional 20 minutes of redirect) was an inappropriately short amount of time.

Similarly, Ms. Branch's claim that she had insufficient time to examine Mr. Gurneal is unsupported by the record. As with the examination of Ms. Keefer, Ms. Branch's examination of Mr. Gurneal was largely repetitive, as counsel spent most of the time asking Mr. Gurneal whether he followed the Post Office's policies in terminating Ms. Branch. *See, e.g.,* [*id.* at 70:3-4 ("Q: And do you believe that policies should be followed because it prevents discrimination?"); *id.* at 71:13-14 ("Q: And as a manager, you would have read that policy; right?"); *id.* at 85:19-21 ("Q: Mr. Gurneal, we just took a break, and do you recall I was asking you a little bit about the policies before that break?"); *id.* at 98:14-17 ("Q: You have a policy. You don't follow it. A person that's black gets fired. If that happens, do you believe that that indicates that that person was discriminated against?"); *id.* at 98:23-24 ("Q: But it's not important enough to follow policies in this situation?"); *id.* at 102:25-103:2 ("Q: And if there were witnesses, do you believe that you would have had an obligation under this policy to obtain their written statements?")].

When Ms. Branch's counsel ran out of time after a full hour, the Court noted that counsel "had 60 minutes with this witness, . . . .which is plenty of time to get in all of the incidents" and that counsel has "gone over the same ground a number of times, which has eaten into [his] time." [*Id.* at 114:3-6]. Nonetheless, the Court granted Ms. Branch's counsel an additional five minutes to question Mr. Gurneal after the Post Office chose not to question him. [*Id.* at 119:2-6]. Although Ms. Branch now complains that she did not have enough time to ask Mr. Gurneal about his own termination from the Post Office,[5] she cannot explain why – during the 60+ minutes counsel had to examine Mr. Gurneal – she was unable to ask this question.

In short, Ms. Branch cannot show that she was in any way prejudiced by the imposition of time limits in this case, since any limitations resulted from counsel's own strategic choices, not the time limits themselves.

**D.      The Court Did Not Abuse Its Discretion in the Aggregate.**

Ms. Branch's final point appears to be that even if the above were harmless errors individually, they constituted an abuse of discretion in the aggregate. Ms. Branch states that "Defendant makes no attempt to address the thrust of Ms. Branch's argument that, even if no singular Court ruling tilted the playing field against her, the combination of those erroneous rulings assuredly did. The Court in this matter committed several errors of law that, taken together, made the trial unfair, prejudiced Ms. Branch, and warrant a new trial." [ECF 202 at 1].

This argument, if anything, affirms the Court's decision to deny the motion to amend, and its decision to set time limits at trial. That is, because Judge Phipps properly denied the request to reopen discovery, Ms. Branch's counsel sought to turn the trial into a vehicle for

---

[5] It appears that Ms. Branch wished to probe Mr. Gurneal's 2017 resignation from the Post Office. According to the briefing on motions *in limine* in this case, Mr. Gurneal's resignation occurred after he used his Post Office credit card to purchase personal items, which was a technical violation of the Post Office's rules regarding the use of company-issued credit cards. The Court ruled that while Ms. Branch could ask about the reasons for Mr. Gurneal's resignation, she could not introduce extrinsic evidence on the issue. [ECF 156 at 4]. At trial, she failed to ask such questions, though she had more than an hour to do so.

12

discovery by amending pleadings mid-trial and asking deposition-like, and oftentimes repetitive, questions. Since, as admitted by Ms. Branch, she intended for trial testimony to serve in place of deposition testimony, there was an even greater need to control the presentation of witnesses and put in place presumptive time limits. If the Court had allowed the belated amendment of pleadings and limitless witness testimony, or were now to grant a new trial to allow such conduct, it would constitute a waste of judicial resources and additional cost to the parties.

Trial is not the place for discovery, and Ms. Branch's complaints all, in the aggregate, ultimately center on the fact that her counsel attempted to use the trial for that very purpose. *See Venneman v. BMW Fin. Servs. NA*, LLC, 2:09–CV–5672–ES–SCM, 2013 WL 3188878, at *3 (D.N.J. June 21, 2013) ("the sole purpose of discovery is to add flesh for trial on the parties' respective claims and defenses in the given action. Discovery is not a fishing expedition for potential claims or defenses."). Simply put, there was no prejudice to Ms. Branch, even if considering all her complaints together.

For all of the aforementioned reasons, the Court will **DENY** Ms. Branch's motion for new trial. An appropriate Order follows.

DATED this 13th day of November, 2019.

BY THE COURT:

/s/ J. Nicholas Ranjan
J. NICHOLAS RANJAN
United States District Judge